IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF IOWA
DAVENPORT DIVISION

| | |
|---|---|
| AMERICAN HUNTING INNOVATIONS, L.L.C. a/k/a RDT ARCHERY & a/k/a KEMPF CROSSBOWS; J & S R.D.T ARCHERY, INC.; and JAMES J. KEMPF, an individual, <br><br> Plaintiffs, <br><br> v. <br><br> SAVAGE SPORTS CORPORATION; EXTREME TECHNOLOGIES, INC.; and EXTREME TECHNOLOGIES, INC. d/b/a BOWTECH, <br><br> Defendants. | Case No. 3:12-cv-00096 <br><br><br> **PLAINTIFFS' MEMORANDUM SUPPORTING PROPER CONSTRUCTION OF CLAIMS OF U.S. PATENT NO. 7,708,001 (MARKMAN BRIEF)** |

COME NOW American Hunting Innovations, L.L.C. a/k/a RDT Archery or Kempf Crossbows, J & S RDT Archery, Inc., and James J. Kempf (collectively, "Kempf") and pursuant to Local Rules 7 and 10 submit this Memorandum Supporting Proper Construction of Claims of U.S. Patent No. 7,708,001 (the "'001 Patent").

## TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................................... 1

II.   BACKGROUND FACTS AND TECHNOLOGY AT ISSUE ............................................ 2

III.  PROCEDURAL BACKGROUND ................................................................................... 4

IV.   STANDARDS FOR CLAIM CONSTRUCTION ............................................................ 5

V.    THE CLAIMS OF THE '001 PATENT TO BE CONSTRUED ........................................ 8

   A.   A First String Guide ........................................................................................ 11

i

B.      A Second String Guide .................................................................................. 12

C.      Means for Journaling Said First String Guide to Said First Limb ................................. 13

D.      Means for Journaling Said Second String Guide to Said Second Limb......................... 14

E.      A First String Coupled to said First String Guide and to Said Second String Guide .... 14

F.      A Second String Coupled from a First Point on Said First String Guide Forward of Said

First Journaling Means to a Second Point on Said String Guide Forward of Said Second

Journaling Means ...................................................................................................... 15

G.      A Second String Coupled from a First Point on Said First String Guide to a Second

Point on Said Second String Guide.......................................................................... 16

H.      Means for Retaining Said Second String in a Cocked Position .................................... 17

I.      A Nock Point Provided on Said Second String ............................................................ 18

VI.    CONCLUSION .............................................................................................................. 18

## I.  INTRODUCTION

Kempf filed this lawsuit against Defendants Savage Sports Corporation, Extreme Technologies, Inc., and Extreme Technologies, Inc. d/b/a Bowtech (collectively "Bowtech") due to Bowtech's infringement of Kempf's invention of certain types of lighter, more powerful bows and crossbows covered by the '001 Patent. Specifically, Bowtech is manufacturing, marketing, and selling bows that incorporate technology covered by the '001 Patent without a license.

Kempf asserts that Bowtech has infringed on the '001 Patent. Prior to adjudication, the Court must first determine the scope of the technology covered by the '001 Patent and decide what the '001 Patent claim terms mean. See Markman v. Westview Instruments, Inc., 517 U.S. 370, 390 (1996). As recognized by the Court, "the claims to be construed are [not] complicated." May 2, 2013 Order at 5, ECF No. 40.

The Court only need construe two terms—"first string guide" and "second string guide"—to find that Bowtech has infringed the '001 Patent (see Plaintiffs' List of Claim Terms for Construction, ECF No. 26). Bowtech asserts that the Court must also construe seven additional terms: (1) "means for journaling said first string guide to said first limb;" (2) "means for journaling said second string guide to said second limb;" (3) "a first string coupled to said first string guide and to said second string guide;" (4) "a second string coupled from a first point on said first string guide forward of said first journaling means to a second point on said string guide forward of said second journaling means;" (5) "means for retaining said second string in a cocked position;"  (6) "a second string coupled from a first point on said first string guide to a second point on said second string guide" and (7) "a nock point provided on said second string guide" (see Defendants' Listing of Claims to be Construed and Initial Claim Constructions, ECF No. 27). As will be set forth herein, Kempf's proposed claim constructions are not complicated

1

and reflect common English, whereas Bowtech's proposed contructions are convoluted and not justified by the language of the '001 Patent.

## II.     BACKGROUND FACTS AND TECHNOLOGY AT ISSUE

Bows that shoot arrows have not changed much in 10,000 years. Primitive bows were merely a flexible stick connected by a string and had size, power, and archer accuracy limitations. To increase power and reduce size, a "recurved" bow was invented that increased the power and reduced the size of the bow. Even so, the archer still had to hold the string in the cocked position while acquiring a target, increasing archer fatigue and reducing accuracy.

What was needed was a bow that had a heavy initial draw, for power, but that "let off" at a certain point, so that the archer could hold the string in the cocked position with much less force. In 1966, the compound bow was developed to accomplish these goals. A compound bow has pulleys and/or cams added to the ends of much stiffer top and bottom limbs. The pulleys/cams create a reduced mechanical advantage at the start of the draw, and an increased mechanical advantage toward the end of the draw. This makes the compound bow difficult to draw at first, but easier to hold once the string moves toward the fully cocked position. Although compound bows were an improvement over recurved bows, the demand for more powerful, smaller bows continued.

Crossbows, such as those involved in the present case, are merely bows turned on their sides and attached to a stock. Typically, crossbows have shorter, stiffer limbs to provide more power. Crossbows are also provided with a catch to maintain the bowstring in the cocked position, and a trigger to release the bowstring when desired. Crossbows often come with a cocking mechanism, such as a cocking string or a crank, to pull and hold the bowstring into the cocked position. Crossbows allow weak, elderly, and physically disabled archers to wield as

much, or more, power than that of a compound bow.

In either standard bows or crossbows, the farther an archer pulls back an arrow, sometimes called the "powerstroke," the longer the bowstring applies force to the arrow, and the faster the arrow leaves the bow. With a standard bow, the powerstroke cannot be so long as to bring the point of the arrow past the rear of the center of the bow, called the "riser." If this happens, the front of the arrow is no longer supported, and the arrow falls. With a crossbow, the archer can pull the arrow back past the rear of the riser, since the arrow rests on a "rail" provided on the stock. While a crossbow can be provided with a longer powerstroke, a longer powerstroke historically meant a longer rail, and a longer crossbow. Although crossbows provided increased power over compound bows, the demand for more powerful, smaller crossbows continued.

Given that increasing the powerstroke meant moving the bowstring catch further back from the point of the resting bowstring, there had been no way to increase the powerstroke, and therefore the power, of the crossbow without increasing the length of the crossbow.

Kempf is an inventor of novel bows and crossbows and has decades of experience in the industry. Kempf overcame the powerstroke limitation problem that had existed since the introduction of the compound bow by moving the bowstring forward. Before Kemp's invention, bowstrings came off of the rear of the pulleys/cams (see Figure 5). Kempf's invention, as embodied in the '001 Patent, located the bowstring off of the front of the pulleys/cams (see Figure 4). Kempf's innovation increased the powerstroke by the diameter of the pulleys/cams, allowing for the construction of bows with more power and/or less length as shown in the figures below.

3



This change was counterintuitive but not complicated. The location of existing cables, required to operate the compound bow, meant moving the bowstring forward required a complete redesign of the bow.

### III.    PROCEDURAL BACKGROUND

On March 22, 2006, Kempf filed the '001 Patent application with the United States Patent and Trademark Office (the "USPTO") to patent his invention and concomitant complete bow redesign (see '001 Patent File Wrapper, Appendix pp. 1-134). The '001 Patent application covered bows and crossbows with Kempf's new technology that allows the bowstring to be pulled back further on a smaller bow or crossbow (Id.). On May 4, 2010, the USPTO granted the '001 Patent (Id.)

Beginning in January 2011 until after January 2012, Kempf observed Bowtech manufacturing, marketing and selling crossbows that he suspected used the same technology he

had patented with the '001 Patent (Complaint ¶¶ 15-16, ECF No. 1). Kempf confirmed his

suspicions by obtaining one of the infringing crossbows for analysis (Id. at ¶16). During and

after January 2012, Kempf informed Bowtech of the existence of the '001 Patent and of

Bowtech's infringing conduct (Id. at ¶17). Bowtech acknowledged the '001 Patent, but refused to

stop using, making and selling the infringing crossbows (Id.). Bowtech continues to trample on

Kempf's patent rights by taking up market share without paying Kempf, thereby depriving

Kempf of the value of his invention

On July 20, 2012, Kempf filed this lawsuit against Bowtech for infringement of the '001

Patent (Id.). On October 23, 2012, Bowtech filed its answer and counterclaims for a declaration

of non-infringement and invalidity of the '001 Patent (ECF No. 10). On February 8, 2013, the

parties filed their claims to be construed and initial claim constructions (ECF Nos. 26, 27). In

addition, the parties have exchanged claim construction expert reports and rebuttal reports

(Plaintiffs' Report, App. pp. 135-187; Defendants' Report, App. pp. 188-196; Plaintiffs'

Rebuttal, App. pp. 197-244; and Defendants' Rebuttal, App. pp. 245-287).

In anticipation of claim construction for the '001 Patent, the Court set a Markman

Hearing for June 20, 2013 (ECF No. 22).


**IV.     STANDARDS FOR CLAIM CONSTRUCTION**

Claim construction is a matter of law ceded to a judge in the normal course of a trial.

Markman, 517 U.S. at 390. The primary goal of claim construction is to allow the Court to give

the jury "guidance that can be understood and given effect by the jury once it resolves the issues

of fact which are in dispute." Sulzer Textil A.G. v. Picanol N.V., 358 F.3d 1356, 1366 (Fed. Cir.

2004) (quotation omitted). "[P]atents are to receive a liberal construction, and . . . to be so

interpreted as to uphold and not to destroy the right of the inventor." Nazomi Commc'ns, Inc. v.

Arm Holdings, PLC, 403 F.3d 1364, 1368 (Fed. Cir. 2005) (quotation omitted). Therefore, claims should be construed to preserve the validity of the patent. Rhine v. Casio, Inc., 183 F.3d 1342, 1345 (Fed. Cir. 1999).

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (citing Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc., 381 F.3d 1111, 1115 (Fed. Cir. 2004)). "It is well-settled that, in interpreting an asserted claim, the court should look first to the intrinsic evidence of record, i.e., the patent itself, including the claims, the specification and, if in evidence, the prosecution history." Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996). Claim construction starts with the language in the asserted claim itself. See Phonometrics Inc. v. N. Telecom Inc., 133 F. 3d 1459, 1464 (Fed. Cir. 1998).

In construing the breadth and scope of patent claims, the Court gives the words of a claim their "ordinary and customary meaning." Phillips, 415 F.3d at 1312. Unless an inventor indicates within the patent that words are used extraordinarily, courts give the words in the claims their common meanings. Hoganas AB v. Dressers Indus. Inc., 9 F.3d 948, 951 (Fed. Cir. 1993).

"Ordinary and customary" is viewed in light of how someone of ordinary skill in the art would have understood the claims as of the date the patent was filed.  Phillips. 415 F.3d at 1313. Accordingly, in this case, the words of the claims of the '001 Patent must be given the meaning the words would have had to a person of ordinary skill in the art of shooting bows on March 22, 2006. Even though claims terms are understood in light of the specification, courts cannot import limitations from the specification into the claims. Id. at 1323. While courts may look to intrinsic evidence for context, courts cannot import claim limitations from the patent specification or

prosecution history when interpreting the ordinary and customary meaning of a word in a claim. Texas Digital Sys., Inc. v. Telegenix, 308 F.3d 1193, 1201 (Fed. Cir. 2002).

It is a "cardinal sin" to import limitations from the written description into the claim. SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc., 242 F.3d 1337, 1340 (Fed. Cir. 2001) (citing Comark Commc'ns, Inc. v. Harris Corp., 156 F.3d 1182, 1186 (Fed.Cir.1998)). The disclosure of a single or preferred embodiment does not limit the invention to the features described in the disclosed embodiment. Gemstar-TV Guide Int'l, Inc. v. Int'l Trade Comm'n, 383 F.3d 1352, 1366 (Fed. Cir. 2004); see also Phillips, 415 F.3d at 1323 (holding that claims are not confined to specific embodiments of an invention).

Courts may rely on extrinsic evidence to interpret claim language only if the intrinsic evidence is insufficient to resolve the ambiguities in disputed claim language. Vitronics, 90 F.3d at 1583. Even if the court does use extrinsic evidence, the court may not use such extrinsic evidence to vary or contradict the meaning of the claim language made clear from intrinsic evidence. Id. Courts may not use such extrinsic evidence to arrive at a claim construction at odds with the claim construction inherent in the intrinsic evidence. Key Pharms. v. Hereon Labs. Corp, 161 F.3d 709, 716-717 (Fed. Cir. 1998).

The doctrine of claim differentiation precludes reading limitations found in narrower, dependent claims into broader, independent claims. Kalman v. Kimberly-Clark Corp., 713 F.2d 760, 770 (Fed. Cir. 1983) cert. denied 465 U.S. 1026 (1984); Wenger Mfg., Inc. v. Coating Mach. Sys. Inc., 239 F.3d 12225, 1233 (Fed. Cir. 2001).

If a claim term appears in more than one claim, it should be construed the same in each. See CVI/Beta Ventures, Inc. v. Tura LP, 112 F.3d 1146, 1159 (Fed. Cir. 1997). Consistent use of a claim term throughout the specification and prosecution history may qualify as an implicit

7

definition. <u>Bell Atlantic Network Servs., Inc. v. Covad Comm'ns Group, Inc.</u>, 262 F.3d 1258, 1271 (Fed. Cir. 2001).

## V.  THE CLAIMS OF THE '001 PATENT TO BE CONSTRUED

The '001 Patent has thirteen claims (<u>see</u> App. pp. 7-8). At issue in this lawsuit are Claims 3, 4, 6-8, 10, and 12. Claim 3 is an independent apparatus claim, with one relevant dependent claim, namely Claim 4. Claim 6 is an independent apparatus claim, with two relevant dependent claims, namely Claims 7-8. Claims 10 and 12 are also independent apparatus claims. Even though seven claims are at issue, based on the parties' filings, the Court has been asked to construe twenty-six terms (<u>see</u> Defendants' Listing of Claims to be Construed and Initial Claim Constructions, ECF No. 27). However, the terms to be construed are not complicated and many appear in multiple claims as shown in the following table:

| Term to be Construed | Relevant Claims |
|---|---|
| "a first string guide" | 3, 4, 6-8, 10, 12 |
| "a second string guide" | 3, 4, 6-8, 10, 12 |
| "means for journaling said first string guide to said first limb" | 3, 4, 6-8, 10, 12 |
| "means for journaling said second string guide to said second limb" | 3, 4, 6-8, 10, 12 |
| "a first string coupled to said first string guide and to said second string guide" | 3, 4, 6-8, 10, 12 |
| "a second string coupled from a first point on said first string guide forward of said first journaling means to a second point on said string guide forward of said second journaling means" | 3, 4, 6-8 |
| "a second string coupled from a first point on said first string guide to a second point on said second string guide" | 10, 12 |
| "means for retaining said second string in a cocked position" | 6-8 |
| "a nock point provided on said second string" | 10 |

App. pp. 7-8.

Because of the doctrine of consistent use, the Court need only construe each term once. See Bell Atlantic, 262 F.3d at 1271; CVI/Beta Ventures, 112 F.3d at 1159. Therefore, the following proposed constructions apply equally to each of the seven claims at issue in this litigation.

Based on the standards for claim construction set forth above and the uncomplicated nature of the technology and claims to be construed, liberal construction of the terms at issue should result in uncomplicated constructions. The '001 Patent does not indicate that the inventor intended any of the terms to be used in an extraordinary fashion; therefore the terms should be construed according to their common meaning. As shown in the following table, Kempf's proposed constructions comport with the Court's previous assessment of the claims as uncomplicated, whereas Bowtech's proposed constructions import new limitations and unduly complicate the claims of the '001 Patent. See May 2, 2013 Order at 5, ECF No. 40 ("Neither the invention nor the claims to be construed are complicated. Involved is an archery bow with basic mechanics.").

| Term to be Construed | Kempf's Proposed Construction | Bowtech's Proposed Construction |
|---|---|---|
| "a first string guide" | "anything that guides a string" | "a first cam or pulley for guiding a string as it is taken up or let out when an arrow is drawn back for shooting and released" |
| "a second string guide" | "anything that guides a string" | "a second cam or pulley for guiding a string as it is taken up or let out when an arrow is drawn back for shooting and |

| | | released" |
|---|---|---|
| "means for journaling said first string guide to said first limb" | "anything that journals the first string guide to the first limb" | "an axle that rotatably mounts the first string guide to a first limb" |
| "means for journaling said second string guide to said second limb" | "anything that journals the second string guide to the second limb" | "an axle that rotatably mounts the second string guide to a second limb" |
| "a first string coupled to said first string guide and to said second string guide" | "any string coupled to at least two string guides" | "a first string is received by the first and second string guides such that the frist string is taken up or let out by the string guides as the arrow is drawn back for shooting and released" |
| "a second string coupled from a first point on said first string guide forward of said first journaling means to a second point on said string guide forward of said second journaling means" | "any string coupled to the fronts of the string guides" | "a bowstring is received by the first string guide at a point of first contact with the first cam or pulley (the first point) and the second string guide at a point of first contact with the second cam or pulley (the second point) such that the bowstring is taken up or let out by the string guides, and the first point is forward of the axle that mounts the first string guide and the second point is forward of the axle that mounts the second string guide" |
| "a second string coupled from a first point on said first string guide to a second point on said second string guide" | "any string coupled to the string guides" | "a bowstring is received by the first string guide at a point of first contact with the first cam or pulley (the first point) and the second string guide at a point of first contact with the second cam or pulley (the second point) such that the |

10

| | | bowstring is taken up or let out by the string guides" |
|---|---|---|
| "means for retaining said second string in a cocked position" | "anything that holds the string in a cocked position" | "a releasable catch mechanism for maintaining the bowstring in a drawn position" |
| "a nock point provided on said second string" | "the point on the string where the nock of an arrow/bolt is positioned" | "a component positioned on the bowstring to receive and position the rear tip of the arrow" |

See ECF Nos. 26, 27.

### A.      A First String Guide

Kempf's proposed construction of "a first string guide" is simple and follows the common meaning of the words used. A first string guide is "anything that guides a string."

As noted by this Court, this is not complicated. The ordinary and common usage of the language "string guide" dictates that the claim covers anything that guides a string. See Phillips, 415 F.3d at 1312.

The '001 Patent consistently uses "first string guide" as being a broader term than merely a "cam" or "pulley." If the drafter of the '001 Patent had intended the term "string guide" to be the equivalent of "cam" or "pulley," he would have used "cam or pulley," instead of the broader term "string guide." Cams and pulleys were well known in the prior art on March 22, 2006, and are used throughout the '001 Patent. The use of "cam," "pulley," and "string guide" in the claims and specification (other information included in the patent but not part of claims) leads to the inescapable conclusion that the patent drafter intended the term "string guide" to be broader than the terms "cam" and "pulley," to include any type of connection known in the art. Nothing in the '001 Patent limits the definition of "string guide" to a cam or a pulley. As noted specifically in the '001 Patent "Although the invention has been described with respect to a preferred

11

embodiment thereof, it is also to be understood that it is not to be so limited, since changes and modifications can be made, which are within the full, intended scope of this invention, as defined by the appended claims." App. p. 7.

Bowtech's assertion that the "a first string guide" should be limited to "a first cam or pulley for guiding a string as it is taken up or let out when an arrow is drawn back for shooting and released" unduly complicates the claim and limits the four words to be construed . More importantly, however, the '001 Patent includes no language that could justify importing additional limitations regarding cams or pulleys or when strings are taken up or let out. The Court is not authorized to write in limitations that are not supported by the common meaning of the words used in the claim. See Texas Digital, 308 F.3d at 1201; SciMed Life, 242 F.3d at 1340.

The language of the '001 Patent is unambiguous as to "a first string guide;" therefore, there is no justification for resorting to extrinsic evidence to justify Bowtech's interpretation. See Vitronics, 90 F.3d at 1583.

### B.    A Second String Guide

Kempf's proposed construction of "a second string guide" is simple and follows the common meaning of the words used. A second string guide is "anything that guides a string."

Like the previous term, this is not complicated. For the same reasons set forth for "a first string guide" the language of the '001 Patent unambiguously militates in favor of liberal construction of the term to include anything that guides a string. The intrinsic evidence is unambiguous and nothing in the '001 Patent justifies importing the additional limitations asserted in Bowtech's proposed construction.

As noted in the '001 Patent "Although the invention has been described with respect to a preferred embodiment thereof, it is also to be understood that it is not to be so limited, since

changes and modifications can be made, which are within the full, intended scope of this invention, as defined by the appended claims." App. p. 7. Indeed, even the preferred embodiment described in the '001 Patent (which indicates a cam as the second string guide) does not require limiting the second string guide to a cam according to the patent itself or the law governing claim construction. See Gemstar-TV Guide, 383 F.3d at 1366 (holding that the disclosure of an embodiment does not require limitation of the invention to the features described in the disclosed embodiment).

Therefore, for the reasons set forth in the previous section, the Court should construe "a second string guide" consistent with "a first string guide" to include anything that guides a string. See Bell Atlantic, 262 F.3d at 1271.

### C.     Means for Journaling Said First String Guide to Said First Limb

Kempf's proposed construction of "means for journaling said first string guide to said first limb" is simple and follows the common meaning of the words used. Means for journaling said first string guide to said first limb is "anything that journals the first string guide to the first limb."

Again, this is simple terminology and technology. See May 2, 2013 Order at 5, ECF No. 40. The language used is not ambiguous. Application of the common meaning of words dictates an uncomplicated construction of this term—uncomplicated as the technology at issue. See Phillips, 415 F.3d at 1312-13

However, to avoid the obvious infringement of its bows on the '001 Patent, Bowtech attempts to introduce a complicated claim construction. Bowtech asserts that the language should be construed to be "an axle that rotatably mounts the first string guide to a first limb." However, "axle that rotatably mounts" is not a limitation included in the patent. By asserting the non-

existent limitation, Bowtech asks the Court to commit the "cardinal sin" of importing limitations from the written description into the claim. SciMed Life, 242 F.3d at 1340.[1]

### D.     Means for Journaling Said Second String Guide to Said Second Limb

Like the previous term, "means for journaling said second string guide to said second limb" is simple. Thus, like the previous term, a means for journaling said second string guide to said second limb is "anything that journals the second string guide to the second limb.

For the same reasons set forth above, the Court should construe this term consistent with the previous term to mean anything that journals the second string guide to the second limb. See Bell Atlantic, 262 F.3d at 1271.

### E.     A First String Coupled to said First String Guide and to Said Second String Guide

Kempf's proposed construction of "a first string coupled to said first string guide and to said second string guide" is "any string coupled to at least two string guides." The proposed construction maintains the common and ordinary meaning of the words used and reflects the uncomplicated nature of the mechanics described.

This language is readily construed pursuant to the plain meaning of the claim itself. See Phonometrics, 133 F. 3d at 1464. The explicit language of the claim describes a string connected to two string guides, without any additional limitations apparent from the language of the '001 Patent. Because the language is clear, the Court may construe the claim based on the language alone. See id.

---

[1] The specification plainly provides that an axle can act as a journal point. However, if Bowtech contends that limiting the term to an axle somehow places their infringing bows outside the scope of the '001 Patent, Kempf asks the court to require Bowtech to show why the term "axle" places their infringing bows outside the scope of the '001 Patent, and to allow Kempf a fair opportunity to address Bowtech's apparently *sui generis* interpretation of the very broad term "axle."

From the straightforward description of the technology described by this term, however, Bowtech proposes the overreaching construction of "a first string received by the first and second string guides such that the first string is taken up or let out by the string guides as the arrow is drawn back for shooting and released." The language of the '001 Patent does not contemplate such a specific and limiting interpretation and it is improper for the Court to import such limitations. See  Phillips, 415 F.3d at 1323. Because Bowtech's proposed construction is not supported by the language of the '001 Patent, Bowtech must be deriving its metes and bounds from the specifications of their own bows to avoid liability for infringement.

The '001 Patent does not use the words "received," "taken," or "let." Indeed, the '001 Patent never mentions anything, even in the preferred embodiment, about the invention being limited as Bowtech asserts.

**F.      A Second String Coupled from a First Point on Said First String Guide Forward of Said First Journaling Means to a Second Point on Said String Guide Forward of Said Second Journaling Means**

Kempf's proposed construction of this term is "any string coupled to the fronts of the string guides."

The language to be construed appears on its face to be a little more complex than the previous language, but upon examination it only employs more words and is uncomplicated. This is where the heart of the invention lies. As discussed above, Kemp's invention relates to increasing the powerstroke of the bow by moving the bowstring closer to the riser, by having the bowstring come off of the front, rather than the rear, of the string guides. This configuration maintains the bowstring in contact with the arrow longer, increasing both speed and power, without requiring a deeper draw or longer crossbow stock.

In its essence, this language means is that the bowstring is coupled to the fronts of the

string guides—as opposed to the rears of the string guides, which is how bows had been previously constructed. Kempf's proposed construction is supported by the specification, where it plainly provides that the bowstring is provided across the forward portion of the string guides, which increases the draw length of the bow and thus increases the powerstroke as shown below.



Bowtech's proposed construction again uses the quixotic "taken up" and "let out" completely absent in any portion of the '001 Patent claims, specification, or drawings. Again, the '001 Patent includes no language that could justify importing additional limitations regarding when strings are taken up or let out. The Court is not authorized to write in limitations that are not supported by the common meaning of the words used in the claim. See Texas Digital, 308 F.3d at 1201; SciMed Life, 242 F.3d at 1340.

### G.      A Second String Coupled from a First Point on Said First String Guide to a Second Point on Said Second String Guide

Kempf's proposed construction of this term is "any string coupled to the string guides."

This language is readily construed pursuant to its common and ordinary usage. From the patent itself, the language is clear and unambiguous.

Bowtech's proposed construction, however, would import limitations on this language in direct contravention to the prohibition against varying or contradicting the meaning of the claim language made clear from intrinsic evidence. See Vitronics, 90 F. 3d at 1583. Bowtech's proposed construction language— "received by the first string guide," "point of first contact," "taken up," and "let out"—are not only absent from any of the claims, none of this language is found anywhere in the '001 Patent.

The language at issue is simple: "a second string coupled from a first point on said first string guide to a second point on said second string guide." The construction is as simple: "any string coupled to the string guides." Any additional complexity is adds unwarranted limitations to the claims.

## H.      Means for Retaining Said Second String in a Cocked Position

Kempf's proposed construction for "means for retaining said second string in a cocked position" follows the common and ordinary usage of the language employed, i.e., "anything that holds the string in a cocked position."

Because the language is clear and unambiguous, the Court need look no further, especially if further construction would import additional limitations not apparent from the language of the claim itself. See Key Pharms., 161 F.3d at 716-717; Vitronics, 90 F. 3d at 1583. Nevertheless, Bowtech again asserts a construction that is much more complicated and limiting than the '001 Patent dictates. Bowtech argues that construction should include a "releasable catch" not described by the plain language of the '001 Patent. Even if, in practice, the means for retaining the string is a releasable mechanism, such a limitation cannot be written into the claims.

17

See SciMed Life, 242 F.3d at 1340.

> ### I.   A Nock Point Provided on Said Second String

Kempf's proposed construction of "a nock point provided on said second string" is "the point on the string where the nock of an arrow/bolt is positioned."

This language is simple and readily construed pursuant to its common meaning to someone of ordinary skill in the art. The language is unambiguous and the nock point is a point on the string where the nock of the arrow is positioned.

Bowtech, however, contends that the nock point is a physical object, "a component positioned on the bowstring to receive and position the rear tip of the arrow." What Bowtech is referring to is not a nock point, but a nock locator. Nothing anywhere in Claim 10, any of the other claims, the patent specification, the drawings, or the prosecution history supports such a construction. Indeed, nothing in the entire patent hints, or even suggests, that the nock point, is a physical object—rather, it is merely a point on the string. Construing the claim to require a component would inappropriately import a limitation not specified in the claim.

The drawings of the '001 Patent, at the point where the nock point is identified, do not show any physical structure. It is inappropriate to manifest an object where none is shown, and contrary to the established rules of claim interpretation.


## VI.   CONCLUSION

Based on the foregoing, the '001 Patent deserves protection. The terms to be construed are not complicated and the construction should track the common language used in the claims as opposed to the strained constructions Bowtech proposes. Accordingly, the Court should adopt Kempf's proposed constructions of the terms at issue.

Respectfully Submitted,

By: ___/s/ J. Campbell Helton_____
J. Campbell Helton          AT 0003425
Matthew D. Giles            AT0010196
Brett Trout

WHITFIELD & EDDY, P.L.C
317 Sixth Avenue, Suite 1200
Des Moines, Iowa  50309-4195
Telephone (515) 288-6041
Facsimile (515) 246-1474
Helton@Whitfieldlaw.com
Giles@Whitfieldlaw.com

LAW OFFICES OF BRETT J. TROUT
516 Walnut Street
Des Moines, Iowa  50309
Telephone: (515)
Facsimile: (515)
Trout@bretttrout.com

ATTORNEYS FOR PLAINTIFFS

<u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on May 17, 2013, a true copy of the foregoing instrument was served upon each of the attorneys of record for all parties to the above-entitled cause through the Court's CM/ECF system:

Peter E. Heuser
Kimvi To
Schwabe, Williamson & Wyatt
1211 SW 5th Avenue, Suite 1900
Portland, OR  97204
pheuser@schwabe.com
kto@schwabe.com

Martha Shaff
Betty, Nueman & McMahon PLC
111 East Third Street, Suite 600
Davenport, IA 52801
mls@bettylawfirm.com


ATTORNEYS FOR DEFENDANTS

                                        WHITFIELD & EDDY, P.L.C.
                                        317 Sixth Avenue, Suite 1200
                                        Des Moines, IA  50309
                                        Telephone:  (515) 288-6041
                                        Facsimile:  (515) 246-1474
                                        Giles@Whitfieldlaw.com

                                        By:     /s/ Matthew D. Giles
                                                Matthew D. Giles