1

```
 1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE SOUTHERN DISTRICT OF IOWA
 2                       DAVENPORT DIVISION

 3
   AMERICAN HUNTING INNOVATIONS,   )
 4 L.L.C., a/k/a RDT ARCHERY and   )
   a/k/a KEMPF CROSSBOWS; J & S     )
 5 R.D.T. ARCHERY, INC.; and       )  ORIGINAL
   JAMES J. KEMPF, an              )  CIVIL NO. 3:12-cv-96
 6 Individual,                     )
                                   )  TRANSCRIPT OF
 7           Plaintiffs,           )  PROCEEDINGS
                                   )  MARKMAN HEARING
 8           -vs-                  )
                                   )
 9 SAVAGE SPORTS CORPORATION;      )
   EXTREME TECHNOLOGIES, INC.;     )
10 and EXTREME TECHNOLOGIES,       )
   INC., d/b/a BOWTECH,            )
11                                 )
             Defendants.           )
12

13

14       TRANSCRIPT OF PROCEEDINGS, held before the Honorable John

15 Jarvey, at the Federal Courthouse, Davenport, Iowa, commencing

16 at 1:26 p.m., July 9, 2013, reported by Linda Faurote-Egbers,

17 Certified Shorthand Reporter for the State of Iowa.

18

19                       APPEARANCES

20 Plaintiff by:            BRETT J. TROUT
                            Attorney at Law
21                          516 Walnut Street
                            Des Moines, IA  50309
22

23 Defendant by:            PETER E. HEUSER
                            Attorney at Law
24                          1211 S.W. Fifth Avenue
                            Suite 1900
25                          Portland, OR  97204
```

2

1          THE COURT:  Please be seated.  The record can reflect

2     that we are here in the matter of American Hunting Innovations

3     and others versus Savage Sports Corporation and others, it is

4     Civil Case 3:12-cv-96.  We are here for a hearing on the

5     parties' claim construction, also known as a Markman hearing.

6          I understand that each side only plans to have oral

7     argument today, there's nothing else -- no evidentiary

8     presentation, correct, Mr. Trout?

9          MR. TROUT:  Yes, Your Honor, that's correct.

10          MR. HEUSER:  Yes, Your Honor.

11          THE COURT:  We will hear from the Plaintiff first.

12          MR. TROUT:  May it please the Court.  What we are

13     talking about today is a crossbow and I apologize that we don't

14     have a crossbow here today.  I was thinking we might be able to

15     have one, but what we are basically looking at is archery bows

16     and more particularly a crossbow there is a crossbow from the

17     '001 patent.

18          Basically the parts of a crossbow are the riser which

19     is this portion here (Indicating) -- I don't know if Your Honor

20     can see.

21          THE COURT:  Yes.

22          MR. HEUSER:  You are free to use this if you like.

23          MR. TROUT:  Thank you.  Your Honor, may I approach?

24          THE COURT:  Yes.

25          MR. TROUT:  If I can hand that to the Court.

Case 3:12-cv-00096-JAJ-RAW   Document 55   Filed 07/26/13   Page 3 of 48
AMERICAN HUNTING INNOVATIONS vs. SAVAGE SPORTS CORPORATION

3

1            THE COURT:  You couldn't bring the whole thing?

2            MR. HEUSER:  I was a little concerned about getting

3     through security.

4            THE COURT:  With a weapon?

5            MR. HEUSER:  Yeah.

6            THE COURT:  Of course our security team is more used

7     to criminal cases.  The big difference between a criminal case

8     and a civil one is they want to kill you before the hearing

9     starts.

10           Go ahead.  I am somewhat familiar with them.  I am an

11    avid hunter, I have never been a bow hunter, never shot a bow

12    like this, but I am somewhat familiar.  I also took it upon

13    myself to go to Gander Mountain yesterday and look at some

14    crossbows and some compound bows.  I am, you know, generally

15    familiar with it.  There's a lot of terms I don't know and we

16    will talk about them along the way.  I assume these (Indicating)

17    are both cams, but I don't know the difference between a cam and

18    a pulley.

19           MR. TROUT:  Yes, Your Honor, those are cams.

20           THE COURT:  Some of those things I will need help

21    with.

22           MR. TROUT:  The overall thought, the reason that

23    doesn't look like a bow from the 1300s is you have this

24    mechanical advantage so that when you pull out, you get a lot

25    more string let out for a little movement in the risers causes a

Case 3:12-cv-00096-JAJ-RAW   Document 55   Filed 07/26/13   Page 4 of 48
AMERICAN HUNTING INNOVATIONS vs. SAVAGE SPORTS CORPORATION

4

1   big movement of the arrow going forward so you get much --

2          THE COURT:  The risers or the limbs?

3          MR. TROUT:  I'm sorry.  The limbs.

4          THE COURT:  Yeah.

5          MR. TROUT:  The limbs.  You're right.  The riser is

6   the crossbar and the limbs are these portions right here

7   (Indicating) and then you have these string guides, in this

8   case, you have -- we have a pulley and then you would have a

9   cam, but the basic premise is the same, that you have a

10  mechanical advantage so that as you pull a little bit here

11  (Indicating) you get a large movement of the string here

12  (Indicating) so you end up with a very, very fast bow compared

13  to a traditional what you would call recurve bow.

14         Then another thing you don't have in a recurve bow

15  would be these cables (Indicating) and they're basically

16  maintaining -- they're keeping the limbs together.  They're

17  maintaining the majority of the weight of keeping the limbs

18  together so you have the bowstring here (Indicating) which goes

19  -- which hooks onto the arrow, which propels the arrow, but then

20  you have these cables here (Indicating) that connect between the

21  string guides to keep the limbs together.

22         Then in a crossbow you have a rail which is basically

23  what the arrow rides on, then you have a catch back here

24  (Indicating) so you don't have to keep holding the bowstring

25  back and the bow strings are so much -- they hold so much more

Case 3:12-cv-00096-JAJ-RAW   Document 55   Filed 07/26/13   Page 5 of 48
AMERICAN HUNTING INNOVATIONS vs. SAVAGE SPORTS CORPORATION

5

1  weight than a typical recurve bow or even a typical compound

2  bow, you can't even cock that manually, you have to have a

3  special leverage advantage to even cock a crossbow.

4       THE COURT:  Yeah, I watched that on Mr. Kempf's

5  website the other day too.  I saw how all that is done.

6       MR. TROUT:  Great.  Then basically you have a trigger

7  so what you do is you pull the bowstring back, there's a little

8  footster up there, sometimes you need that much advantage to

9  just put your foot in that footster up there, (Indicating)

10  that's that chunky thing in the end, then you have -- like you

11  saw in the video, you lock the string in the catch, place the

12  arrow on the rail, you aim, and you pull the trigger.

13       So why the crossbow in the '001 is better than the

14  other crossbows, why it is so advantageous.  The advantage is is

15  that you have normal crossbows which have the bowstring come

16  from the rear and so you cock the arrow back and you shoot it.

17       On Mr. Kempf's patent, you have the bowstring going in

18  the front and it doesn't seem like it makes much difference, but

19  what you end up having is this difference here is the additional

20  amount of time in which the bowstring is coupled to the arrow

21  and propelling the arrow and the total distance is called the

22  power stroke, the total distance that the string is propelling

23  the arrow, and if you get this increased power stroke, you get a

24  faster bow and you can make a smaller bow, everything else being

25  equal, or you can make a faster, smaller bow, so basically by

Case 3:12-cv-00096-JAJ-RAW   Document 55   Filed 07/26/13   Page 6 of 48
AMERICAN HUNTING INNOVATIONS vs. SAVAGE SPORTS CORPORATION

6

1    keeping the bowstring on that much extra gives you a huge

2    advantage in power over standard bows that all the other bows

3    that have the bowstring going across the rear string guides like

4    this.  (Indicating)

5              THE COURT:  And that's the only thing that is novel on

6    this, correct, or not?

7              MR. TROUT:  Right, that's basically the -- the

8    increased power stroke is the only thing that's novel on this.

9              THE COURT:  And coming only from or mostly from the

10   fact that the string goes in a forward position rather than the

11   rear?

12             MR. TROUT:  Exactly, Your Honor.  Okay.  So basically

13   we're -- what is odd is that we are not talking about the

14   increased bow stroke -- the increased power stroke today, all we

15   are talking about is the string guides which is as you saw when

16   you went to the store, they're on every compound bow, every

17   compound crossbow, they all have these string guides.

18             So what is a string guide?  The patent shows two

19   examples here, so it is basically anything that guides a string.

20   It is simple technology, anyone can understand.  It is not

21   rocket science.  Basically the reason that you use string guides

22   is because we don't need to have it be very narrow because it is

23   not the heart of the invention, it is not the novelty associated

24   with the invention, every bow has a string guide.

25             THE COURT:  Is the string guide the cam or the pulley

AMERICAN HUNTING INNOVATIONS vs. SAVAGE SPORTS CORPORATION

7

1  or the channel in which the string is riding?

2          MR. TROUT:  Anything that would guide a string so it's

3  a cam, if a cam guides the string, then it is; if it is the

4  channel on something that's maintaining a string in a particular

5  point, then that's what the string guide would be.  Anything

6  that guides a string either horizontally or laterally, anything

7  that would guide a string so, you know, in this example here,

8  (Indicating) it would be the cam here (Indicating) and the

9  pulley would be those two things.  Am I answering --

10          THE COURT:  If there was no cam or there was no

11  pulley, then the axle or what you would call the -- what I would

12  call the axle would be in your opinion the string guide?

13          MR. TROUT:  Your Honor, in this situation would not be

14  because there has to be two separate parts.  There's two

15  separate elements claimed in the claim so there's a journaling

16  means and then there's a string guide so they have to be

17  different components so it would have to be something other than

18  the axle.

19          THE COURT:  Okay.  Is journaling -- that's an odd term

20  to me.  I understand it only in the literary sense.  Is that the

21  axle, journaling?

22          MR. TROUT:  Yes, Your Honor.

23          THE COURT:  It is a method of attaching the cam or

24  pulley to the limb, that's just it, journaling?

25          MR. TROUT:  Well, Your Honor, it is a method of

8

1   attaching and basically what it is is something that rotates

2   relative to something else so if it was a fixed attachment, that

3   wouldn't be journaled.  It would have to be like an axle.

4           THE COURT:  Okay.  Thank you.  It has to rotate to be

5   journaled?

6           MR. TROUT:  Right, the axle can be stationary and it

7   can rotate or it can be stationary and the axle rotate, but

8   you're right, one has to rotate relative to the other.

9           THE COURT:  Thank you.

10          MR. TROUT:  So the reason that string guide is in such

11  broad language to cover so many different things is because it

12  is not the heart of the invention, the heart of the invention is

13  the increased power stroke so why are the claims not limited to

14  the cam or pulley?  If the -- Mr. Kempf, the inventor here, if

15  he would have wanted it to be limited to a cam or pulley, he

16  could certainly have stated that in the claims.  He

17  intentionally did not state that in the patent claims because

18  the invention is so much broader, basically anything that would

19  have any kind of a string guide with this increased power

20  stroke.

21          THE COURT:  A couple of the claims later, like 10 and

22  11 do have a cam or a pulley as the string guide.

23          MR. TROUT:  You're right, Your Honor, so certainly a

24  cam is absolutely a string guide and a pulley is absolutely a

25  string guide.

Case 3:12-cv-00096-JAJ-RAW   Document 55   Filed 07/26/13   Page 9 of 48
AMERICAN HUNTING INNOVATIONS vs. SAVAGE SPORTS CORPORATION

9

1          THE COURT:  Thank you.

2          MR. TROUT:  When the Patent Office reviews a patent,

3    any patent, including the '001 patent, according to the Manual

4    of Patent Examining Procedure they have to read the claims in

5    the broadest reasonable interpretation consistent with the

6    specification, so when they read it, they read string guide as

7    anything that guides a string, having prosecuted patents for

8    many, many years, their idea of what constitutes a broad

9    interpretation is very broad interpretation, so if there was

10   anything in there that would have been in the prior art that

11   would have prevented Mr. Kempf from getting this patent because

12   this thing held a string in a certain way, either laterally or

13   horizontally, the Patent Office would have rejected the claim

14   based on that and then Mr. Kempf would have been required to

15   narrow the claims to something, maybe a cam or maybe a pulley.

16         Under --

17         THE COURT:  I know this doesn't matter, but it does to

18   me anyway.  I don't get why this is so important.  Are you

19   thinking that they're going to design around your patent if it

20   is limited to a cam or a pulley?

21         MR. TROUT:  Yes, Your Honor, I mean, what -- we will

22   get to a little more detail, but basically what they have done

23   is they have taken their bow and they've seen what kind of --

24   how you could possibly read it so it wouldn't read on their bow

25   and they are trying to extract information from the preferred

AMERICAN HUNTING INNOVATIONS vs. SAVAGE SPORTS CORPORATION

10

1   embodiment and put it into the claims because their

2   interpretation, when you see it, it is so strange in such an odd

3   way --

4           THE COURT:  Their bows have cams and pulleys too.

5   That's why I asked the question.

6           MR. TROUT:  And again, Your Honor, I don't know what

7   their position is.  I am guessing their position is is that

8   they're arguing that their string is not coupled to a string

9   guide because their -- they have a pulley on there that's part

10  of their assembly so they have a cam part and a pulley part, but

11  I think -- I'm guessing their argument is going to be that their

12  pulley part is not a string guide for some reason.  That would

13  be my guess.

14          THE COURT:  Thank you.  Now that you mentioned it,

15  that's another word I don't understand.  Coupled.  Nobody is

16  arguing about what coupled means, but I don't fully understand

17  what coupled means in this context.

18          MR. TROUT:  Your Honor, go ahead.  I'm sorry.

19          THE COURT:  No, I'm done.

20          MR. TROUT:  Coupled would be a very, very broad

21  connection.  Journal is very narrow, there has to be that

22  rotation, but coupled can be any way they are put together so if

23  -- if this part, (Indicating) you know, is not -- not touching

24  this part, (Indicating) I mean, if there's nothing in between,

25  then it is not coupled.  If this part (Indicating) is connected

AMERICAN HUNTING INNOVATIONS vs. SAVAGE SPORTS CORPORATION

1    to this part (Indicating) connected to this part, (Indicating)

2    then, you know, it is coupled and how -- how much you can have

3    in between, you know, that's a question maybe for a Trier of

4    Fact; but certainly if they're touching, that's coupled, if

5    there's one piece in between, that's coupled, how many more

6    pieces would kind of depend on the art.

7             THE COURT:  So as we talk about it today in the

8    context of this, you are saying that the string couples the cam

9    and the pulley or what?

10            MR. TROUT:  Yes, Your Honor.

11            THE COURT:  Okay.

12            MR. TROUT:  Yeah, whether they're a cam-cam or

13   pulley-pulley, they do touch both of those parts.

14            THE COURT:  Okay.  Thank you.

15            MR. TROUT:  When the Patent Office is examining a

16   claim, just because you have a very, very broad term like string

17   guide, that doesn't make it indefinite.  As the Federal Circuit

18   has stated, "Claim to a formula containing over 5,000 possible

19   combinations is not necessarily ambiguous if it sufficiently

20   notifies the public of the scope of the claims," so just because

21   a term is very, very broad doesn't necessitate that the Court

22   has to narrow it.  I mean, according to the Rules, it is given

23   the full scope of how it was claimed.

24            I know the Court understands this, but just briefly,

25   the parts of a patent, the first part, they talk about the state

AMERICAN HUNTING INNOVATIONS vs. SAVAGE SPORTS CORPORATION

12

1   of the art, what other people are doing, description of the --

2   detailed description of the preferred embodiment, the drawings,

3   and the claims, and we will go through those in a little detail.

4           The state of the art, that describes what's called the

5   prior art.  I mean, any documentation in the public hands more

6   than a year before the applicant filed the patent is prior art.

7   The reason prior art is important is because if the patentee

8   comes up with something that someone already did, even if the

9   patentee didn't know about it, they don't get a patent.  Quid

10  pro quo is I give the public something new and in return I get

11  this 20-year monopoly and so the prior art is what the Patent

12  Office uses to determine whether you do get the patent or don't

13  get the patent.

14          The preferred embodiment, that's the part of the

15  patent that describes in detail the invention and how you use it

16  and it is very exacting terms because if I have on my preferred

17  -- like if you looked at this-- Your Honor, if you looked at the

18  claims, I think it would be very difficult to even determine

19  what -- what is being described, let alone how to reproduce that

20  without the specification to kind of detail that and the

21  requirement is that the specification be so detailed that if I

22  handed it to someone skilled in the prior art, I give them six

23  months and a million bucks, they would be able to give me my

24  invention, and so it gets extremely detailed, what the parts

25  are, and it names what the specific parts are, even though again

Case 3:12-cv-00096-JAJ-RAW  Document 55  Filed 07/26/13  Page 13 of 48
AMERICAN HUNTING INNOVATIONS vs. SAVAGE SPORTS CORPORATION

13

1  it is just known specifically in a '001 patent, as you can see,

2  it is a detailed description not of the invention, but of a

3  preferred embodiment.

4         Also there's a requirement that it be the best mode.

5  If I know a good way to make it and a bad way to make it, I

6  can't tell the public the bad way and keep the good way to me to

7  make money.  I'm under -- the requirement is is that I tell the

8  best mode to make it.

9         Then we look at the drawings.  Basically that supports

10  the detailed description.  You have a bunch of lead lines and

11  numbers that match up with preferred embodiment just to make it

12  easier for someone to understand.

13         The claims, most important part of the invention, I'm

14  sorry, the most important part of the patent, they define the

15  scope of what the invention is so the job of the state of the

16  art, tell you what the prior art is.  The job of the preferred

17  embodiment, telling you how to make one.  Then the job of the

18  claims is what am I claiming, what am I claiming, what are the

19  metes and bounds of what my monopoly is, and that's why claims

20  are written in such strange language, such broad language, and

21  they don't even necessarily have all the parts that you would

22  need to have.

23         I mean, they don't necessarily -- if you want a

24  cocking device for your -- for a bow, for a crossbow, which most

25  of them do, they are not in the claims because you are only

AMERICAN HUNTING INNOVATIONS vs. SAVAGE SPORTS CORPORATION

14

1  looking at the minimum level of the grouping necessary to claim

2  something that's novel and there's two types of claims,

3  independent claims like this claim three stand on their own and

4  dependent claims say claim three plus this or claim three plus

5  this and this and those are called dependent claims and we have

6  both types in this case.

7          So basically why did Mr. Kempf in his claim limit the

8  claims to a cam or a pulley?  Because in the claims he has two

9  kinds of parts, the parts that are the prior art parts and then

10  the parts that are the novel parts and as we talked about

11  before, the string guides of the prior art parts, every compound

12  crossbow, every compound bow uses those, and then the novelty

13  would be that putting the string in front there, that increased

14  power stroke, and so the part with the cam is -- is drafted

15  very, very broadly because we want to cover every way anybody

16  has ever done that and the Patent Office has looked at every way

17  anyone had ever done that to the extent of their search because

18  they want to make sure there wasn't anything else out there, but

19  we weren't too worried about that because everybody has done it

20  before and then we get to the power stroke, it is drafted very,

21  very narrowly.

22          So because Mr. Kempf drafted the claims the way he

23  wanted those claims, there's no reason to unfairly limit those

24  scopes now.  The claims are intentionally broad to prevent the

25  competitors from designing around it by trying to avoid some of

AMERICAN HUNTING INNOVATIONS vs. SAVAGE SPORTS CORPORATION

15

1  the limitations in the claim because all they have to do really

2  is avoid one limitation in the claim.

3         If they have that increased power stroke, but they

4  change one of the parts, you know, that they don't have a string

5  guide at all, then they don't infringe and so usually they try

6  to mess with the inventive part because that's the part drafted

7  most narrowly.  They don't usually pick on these very broad

8  parts because the claim language in this case is so broad.

9         So the Patent Office gave the string guide its

10  broadest possible interpretation when reviewing the patent and

11  they still granted it because it is so far removed from what the

12  invention is.

13         So let's look at the key question, what is a string

14  guide?  And a string guide would be a cam which is shown there

15  or a pulley or a wheel or a combination of those components,

16  basically anything that guides a string and when Your Honor was

17  speaking before about the trough, you can kind of see that there

18  is this trough, you know, from an end-on view, you can see that

19  that's where the string resides on that assembly.

20         So this is an example from Plaintiffs' claim

21  construction expert witness and this is basically if you can

22  imagine an end-on view of the cam assembly and what you are

23  looking at would be -- the string is in yellow and the walls of

24  the string guide are in red, so if you looked at the cam end-on,

25  and, yeah, you would see -- you can see the top string is just a

AMERICAN HUNTING INNOVATIONS vs. SAVAGE SPORTS CORPORATION

16

1    circle because it has been cross-sectioned, but basically this

2    shows how the string is maintained in a lateral orientation, it

3    is guided laterally from becoming removed from the cam in

4    addition to being moved horizontally.

5            So why does the '001 patent make broad use of a term

6    like string guide?  It is not the heart of the invention,

7    there's no worries about running afoul of the prior art having

8    it declared invalid because some prior art is going to pop up,

9    the increased power stroke is the heart of the invention, and as

10   long as it is associated with any type of string guide in the

11   prior art, it is still covered by the claims.

12           The Manual of Patent Examining Procedure says that,

13   "The pending claims are given their broadest reasonable

14   interpretation consistent with the specification," so as we

15   talked about again, this broadest reasonable interpretation,

16   they didn't have any problem with it when we were going through

17   the vetting process and the granting process at the Patent and

18   Trademark Office.

19           So construing the string guide, where to start, as the

20   Court knows, construing claim language begins and ends with the

21   claims themselves.  It can go the securest route, find other

22   things, but you are going to look at the claims themselves.  The

23   claims define the invention and what we will look at is claim

24   three here, this is an example, and we will go through it and

25   what I have done is I have put in black the portion that talks

1    about string guides since that's what we're worried about here,

2    so if we look at Section B, it says a first string guide, and

3    then C is a means for journaling the first string guide to the

4    first limb, we talked about that before, that would be the cam

5    or the pulley or the wheel journaled to the axle so it is

6    basically coupled to the axle in a way that rotates and then --

7            THE COURT:  The first time you lost me.  I thought the

8    first string guide is the cable and the second one is the

9    bowstring.

10           MR. TROUT:  I apologize, Your Honor.  The first string

11   is the bowstring -- the first string is the cable and the second

12   string is the bowstring.

13           THE COURT:  Yeah, guide, you are talking about guides.

14   Thank you.

15           MR. TROUT:  Then in C -- or talk about D, a second

16   string guide; then E, a means for journaling the second string

17   guide to the second limb, we kind of went through that; then a

18   first string coupled to the first string guide and the second

19   string guide, that would be your cable; and then here is kind of

20   the heart of the invention, a second string coupled from a first

21   point on said first string guide forward of said first

22   journaling means to a second point on said second string forward

23   of said second journaling means, it is a mouthful, but basically

24   you are talking about the strings being coupled in front as

25   opposed to being behind so you get that increased power stroke;

AMERICAN HUNTING INNOVATIONS vs. SAVAGE SPORTS CORPORATION

18

1  and then finally, wherein the arrow is coupled to the second

2  string at a point rearward of the second string guide of the

3  first string guide and of the second string guide so you have to

4  cock it back.

5          THE COURT:  Did you get all that, Linda?  He's pretty

6  quick.

7          MR. TROUT:  They were saying before that I need to

8  speak loudly and loudly is not a problem; but the speed, I will

9  try to keep that more in check.

10          Words are given their common meaning.  Unless it

11  appears the inventor used them differently, the rule is that the

12  inventor can be their own lexicon, or they can make up any

13  definition for any word that they want; but absent some

14  indication that they meant them to be something different than

15  their common meaning, then they are going to be given their

16  ordinary meaning.

17          So basically string guide is simple.  It is something

18  that guides the string.  It is a string guide so it is something

19  that guides it against moving off the cam laterally or moves the

20  string horizontally, but basically guides the string in some

21  manner.

22          According to Federal Circuit, "Patents are to receive

23  a liberal construction and to be interpreted to uphold and not

24  destroy the right of the inventor," so Mr. Kempf, you know, he

25  didn't just throw these claims up, I mean, these claims were

Case 3:12-cv-00096-JAJ-RAW   Document 55   Filed 07/26/13   Page 19 of 48
AMERICAN HUNTING INNOVATIONS vs. SAVAGE SPORTS CORPORATION

19

1  battered and beaten around before they were submitted because he

2  had to make sure they fully encompassed the scope of his

3  invention so going to all that trouble, the Federal Circuit

4  states that we can't interpret those claims to destroy the

5  rights that he worked so hard to obtain.

6          He used -- intentionally used very broad language, the

7  Patent Office allowed it.  Nothing limits the construction so

8  there's nothing in the claim, nothing in the specification, and

9  there's nothing in the prosecution history that would limit that

10 string guide interpretation that we just discussed.  It doesn't

11 indicate that Mr. Kempf intended any words to be used other --

12 like in an extraordinary fashion.  There's nothing in the

13 specification.  It is tough for me, I wish we could have an

14 example, but I can't really prove a negative, but I am sure we

15 will get into that a little later, but accordingly, string and

16 guide should be construed according to their common meanings.

17          If Mr. Kempf had intended that the term string guide

18 to be equivalent to cam or pulley, he would have used cam or

19 pulley in the claims instead of the much broader string guide.

20 He did not do this and he should not be restricted as if he had

21 and it is not like he didn't know the difference.  If you look

22 at the claims, cam and pulley are mentioned in some of the

23 claims so he knew what that was so if he wanted to have one

24 claim that it was a cam and one claim that it was a pulley, that

25 would cover everything so he certainly knew the difference.

AMERICAN HUNTING INNOVATIONS vs. SAVAGE SPORTS CORPORATION

20

1        What does the '001 patent say?  And so the rule is you

2   can't pull things out of the specifications and put them into

3   the claims and if that wasn't clear enough, the patent says in

4   the -- in the specification itself, although the invention has

5   been described with respect to a preferred embodiment thereof,

6   it is also to be understood that it is not to be so limited,

7   since changes and modifications can be made therein which are

8   within the full, intended scope of this invention as defined by

9   the appended claims, so it specifically states that this is a

10  preferred embodiment, you can change it, as long as it is

11  covered by the claims, it is covered, even if it is not

12  described in the preferred embodiment.

13        The common meaning of string guide is something that

14  guides a string.  It's that simple.  Anything else is a

15  limitation that violates the rules of claim construction, denies

16  Mr. Kempf the full scope of his patent, and is not supported by

17  any intrinsic evidence, which would be the claims of the spec,

18  the drawings, the prosecution file record, or any extrinsic

19  evidence.

20        There are two competing constructions.  Mr. Kempf's

21  construction is anything that guides a string, the Defendants'

22  construction is a first cam or pulley for guiding a string as it

23  is taken up or let out when an arrow is drawn back for shooting

24  and released.  Seems like a rather odd interpretation,

25  especially since that language is not found in the application

Case 3:12-cv-00096-JAJ-RAW  Document 55  Filed 07/26/13  Page 21 of 48
AMERICAN HUNTING INNOVATIONS vs. SAVAGE SPORTS CORPORATION

21

1  itself.

2       The language of the '001 patent is not ambiguous.

3  There's no justification for resorting to extrinsic evidence to

4  justify Defendants' interpretation.  Our expert, Mr. Michael

5  Sturm, who is formerly a patent examiner with the United States

6  Patent and Trademark Office, he was also a patent agent for a

7  while, he has been a patent attorney since 1974, he still

8  practices, he's drafted patents for archery clients so he is

9  very familiar with archery patents, he's an avid bow hunter

10  since the sixties, bow hunted and shot every year since the

11  seventies, multiple Pope and Young record books, just got one

12  for mule deer, and what that means is that he's a much better

13  hunter than I am.  He has large enough game they can be entered

14  in the record books so by virtue of what he does for a living,

15  namely drafting patents for archery clients, he has to

16  understand the person of ordinary skill in the art with every

17  patent that he drafts, so whether it is an archery patent or

18  not, he still has to know what a person in the ordinary skill of

19  the art is because he still has to draft the patent application

20  for them to understand that.

21       Mr. Sturm's opinion is that the first string guide is

22  everything on the first limb that guides a string, the second

23  string guide is everything on the second limb that guides the

24  string.  He states that the two-word term "string guide" is

25  broad enough to mean anything that guides a string.  Those two

Case 3:12-cv-00096-JAJ-RAW   Document 55   Filed 07/26/13   Page 22 of 48
AMERICAN HUNTING INNOVATIONS vs. SAVAGE SPORTS CORPORATION

22

1    words, "string guide," literally do not require that the string

2    be guided in any particular direction so whether it is forward

3    or backward or horizontally or laterally, it doesn't limit it to

4    how it guides the string, as long as it guides the string.

5          Defendants' expert, 15 years with Hoyt Archery, has a

6    Bachelor's Degree in manufacturing engineering, has an MBA, he

7    is not a lawyer, but he contributed to the development of

8    various archery and firearm products.  This is Mr. Fogg's

9    opinion, the Defendants' expert opinion.  "I have reviewed the

10   prosecution history, but I do not think there is anything in the

11   history pertinent to the above discussion because --"

12         THE COURT:  A little slower.

13         MR. TROUT:  "But I do not think there is anything in

14   the history pertinent to the above discussion.  Because the

15   construction is clear, based upon the patent and my knowledge of

16   the technology, I do not see any reason to refer specifically to

17   extrinsic sources," and that's why you are not really going to

18   see too much in the way of extrinsic sources in -- today because

19   I think we both agree that the claim language is pretty

20   unambiguous, how we agree in completely different ways is odd,

21   but I think we agree that it is pretty straightforward.

22         So Mr. Fogg's opinion, and it is what I call a

23   thin-air opinion because it is not -- there's no -- this

24   language does not appear anywhere in the claims, it doesn't

25   appear anywhere in the patent, doesn't appear anywhere in the

Case 3:12-cv-00096-JAJ-RAW  Document 55  Filed 07/26/13  Page 23 of 48
AMERICAN HUNTING INNOVATIONS vs. SAVAGE SPORTS CORPORATION

23

1  prosecution history, doesn't appear anywhere in any other claim

2  that has ever existed or any other documentation that Mr. Fogg

3  has ever seen so this language, I don't know where it came from,

4  and if you look at it, basically the first string guide is a

5  first cam or pulley for guiding a string as it is taken up or

6  let out when an arrow is drawn back for shooting and released.

7       So we talked about there's no extrinsic or intrinsic

8  evidence and in the deposition of Mr. Fogg he confirmed that,

9  that that language is not found in any documentation that he's

10  run across.  Not only that, but there's no intrinsic or

11  extrinsic evidence, it is not in the claims or in the

12  prosecution history or the specification or anything else, the

13  term let out, just that term, let out, the term take up, that is

14  not found anywhere in any of the claims or anything that he

15  found, any other patents he looked at, all the material he

16  reviewed, those terms aren't anywhere.

17       So that construction is not ordinary and customary

18  meaning, it is not supported by the intrinsic evidence or the

19  extrinsic evidence.  The definition that they have for the

20  construction is tortured to an end.  It looks so odd.  It is

21  oddly specific in an oddly specific way and why is that?

22       Well, because basically the Defendants are using their

23  infringing crossbow as a road map for hindsight calculation as

24  to what the construction is and so, I mean, we are not -- this

25  is not about infringement; but if you look at the Defendants'

Case 3:12-cv-00096-JAJ-RAW  Document 55  Filed 07/26/13  Page 24 of 48
AMERICAN HUNTING INNOVATIONS vs. SAVAGE SPORTS CORPORATION

24

1    interpretation of what the construction is, that is 100 percent

2    about infringement.  You are basically using their bow as a

3    template to try to come up with some language and they couldn't

4    even find any language in the claims or in the prosecution

5    history or in the preferred embodiment that would get crazy

6    enough to get around what they have because that claim language

7    is so broad, so they had to come up with language, they couldn't

8    even find it in another patent or in a treatise.  They couldn't

9    find that language anywhere so they had to come up with it out

10   of thin air.  That's why it looks so odd is because it reads

11   directly on how their bow would avoid infringement.

12          So basically their expert opinion is trying to impart

13   their definition of what their bow is onto Mr. Kempf's patent

14   claims and the only reason is because that's the only way that

15   they can define string guide to avoid infringement.  I would ask

16   how else could you possibly have come up with such an oddly

17   specific definition, that's not found anywhere, I can see that

18   if he found this patent and it had this language in it, he could

19   say well, I think it is relevant, we say we don't think it is

20   relevant or if he found it in a treatise, we could say that

21   applies to bows, not crossbows, but this language does not exist

22   anywhere.  Not only does the language not exist anywhere, this

23   let up and take out business, those two tiny terms don't show up

24   anywhere.

25          There's no way that you would come up with that

AMERICAN HUNTING INNOVATIONS vs. SAVAGE SPORTS CORPORATION

25

1  without -- from our position there's no way that you would come

2  up with that without using the infringing bow as a template so

3  we are looking at the rules for claim construction, it is a

4  cardinal sin to import limitations from the written description

5  into the claim.  Taking cam and pulley out of the preferred

6  embodiment and try putting them in the claim, that's not

7  allowed, that's a cardinal sin.  Disclosure of a single or

8  preferred embodiment does not limit the invention to the

9  features disclosed and the claims are not confined to the

10  specific embodiments and those are all Federal Circuit cases

11  that explain why it is improper to pull that language out of

12  there.

13         So here is a very curious patent that we think would

14  be very helpful to the judge, to the Court.  Mr. Fogg, the

15  Defendants' expert, is listed as an inventor and in the Patent

16  6871643, Mr. Fogg describes -- under the section describes state

17  of the art, and we talked about that before, there's different

18  parts and this part is not talking about Mr. Fogg's invention.

19  This part is talking about what the prior art is so basically, I

20  apologize, you can't see it here very well, this is a section of

21  -- it is in a lighter material, but Your Honor can look at the

22  patent itself, it is column one, lines 28 to 45; but these are

23  just -- I highlighted the parts that are important and this is

24  what Mr. Fogg, Defendants' expert, stated in terms of what the

25  prior art was.

AMERICAN HUNTING INNOVATIONS vs. SAVAGE SPORTS CORPORATION

26

1          The term pulley encompasses a single wheel or an

2   extentric element, but also included an assembly of one or more

3   such components.  Sometimes an extentric or wheel may be

4   identified as a cam substantially in accordance with its

5   ordinary dictionary meaning so according to their expert, pulley

6   is broad enough to cover wheel, to cover pulley, to cover cam,

7   to cover any combination of those.

8          There's no business in here about let up or take out

9   or arrow or pull back, that is not how he defines it when he is

10  defining what the prior art is.  He only defines that as what

11  the prior art is when he defines what our claims are so this is

12  I think very telling because this is the Defendants' expert's

13  testimony when there's not this motivation one way or the other

14  so we can see what the true definition is.  This is their

15  expert, this is not our expert.

16         So basically there's no reference to let up or take

17  out anywhere in Mr. Fogg's patents, even though he said that

18  that's what string guide is, and he defines pulley as covering

19  the very least a pulley, a cam, a wheel, or any combination of

20  those.

21         So basically this patent is very, very simple in terms

22  of claim construction, probably the simplest claim construction

23  case that I have ever run across.  A string guide is something

24  that guides a string.  A string guide is in the claims, it is in

25  the specification, it is in prosecution history, so it is very

AMERICAN HUNTING INNOVATIONS vs. SAVAGE SPORTS CORPORATION

27

1  well detailed what it is and it is very well detailed that if

2  Mr. Kempf had wanted that to be a cam or a pulley, he would have

3  included that in the claims like he did in some of the other

4  claims and some of the dependent claims so Mr. Kempf is entitled

5  to the full scope of his patent as thoroughly vetted and granted

6  by the United States Patent and Trademark Office to mean

7  anything that guides a string.

8          That's the end of the presentation, Your Honor.

9          THE COURT:  You are not going to talk about this nock

10  point thing?

11          MR. TROUT:  Your Honor, my understanding is that -- is

12  that the Defendants have waived the nock point.  I would be more

13  than happy to discuss it on rebuttal if they wanted to get into

14  that.

15          MR. HEUSER:  No, we didn't see any reason to address

16  nock point.  It is not an issue in infringement or validity so

17  we didn't think it was worthwhile so we will defer to their

18  definition on nock point.

19          THE COURT:  Thank you very much.  You pronounce your

20  name Heuser?

21          MR. HEUSER:  Heuser.  Very good.  Not very many people

22  pronounce it properly the first time.  I have hard copies of my

23  PowerPoint.  Would the Court like these?

24          THE COURT:  Thank you.

25          MR. HEUSER:  I also have a first page or a single page

AMERICAN HUNTING INNOVATIONS vs. SAVAGE SPORTS CORPORATION

28

1    from the Phillips decision that we both referenced decided by

2    the Federal Circuit.  The reason I included that is it has the

3    claim language from the Phillips case.

4            Your Honor, I am Peter Heuser representing Savage and

5    Bowtech.  I am -- I live in Portland, but I grew up in Wisconsin

6    so hopefully I will speak even more slowly than sometimes some

7    of us do.

8            To really get down to this case is we know that the

9    question is whether -- whether we're trying to import language

10   from the specification and reading it into the claim.  We know

11   that's a cardinal sin, we know that's what the Phillips case

12   said.  The Phillips case also focused on the Vitronics case and

13   other similar cases to talk about how it is really important

14   that you look to the specification because they provide the best

15   guide as to interpreting the claim language, so Phillips said

16   those things.

17           Chisum, the leading treatise on patents and, in fact,

18   this language was found in Phillips as well, I didn't realize

19   it, at 1323, where the Federal Circuit says it is a fine line

20   between interpreting the claim language to -- in view of the

21   specifications and reading the limitation into the claim

22   language.

23           Now, it is interesting that in the discussion about

24   the cardinal sin language in Phillips, I just read Phillips

25   yesterday again and I -- and I realized it is really important

Case 3:12-cv-00096-JAJ-RAW   Document 55   Filed 07/26/13   Page 29 of 48
AMERICAN HUNTING INNOVATIONS vs. SAVAGE SPORTS CORPORATION

29

1    for this case.  Number one, it is an en banc decision, 2005; it

2    is after all of the cases that the two parties cited to you, so

3    it provides a good explanation of these prior cases.  The

4    cardinal sin language came from the Texas Digital case and

5    SciMed cases that were talking about using the dictionary

6    definitions and actually the Federal Circuit was somewhat

7    critical of those cases in that they overstress the use of

8    dictionary definitions.  That is not at issue here.  We are not

9    talking about dictionary definitions.

10           They did -- the Phillips case did in the end of their

11   discussion about how to apply -- how to interpret claim

12   language.  They said really what we should follow is we should

13   follow the Vitronics case, the Supreme Court Markman case, and

14   the Innova case, so after they analyze all the claims of the

15   prior cases, they then went to the claims at issue because as we

16   all know, the claims are the starting point.

17           Now, what was the issue in Phillips?  It will be

18   helpful here.  The issue in Phillips was there was a -- there

19   was a wall that was used in prisons and the like, the wall had a

20   baffle in it.  Now, the District Court looked at that and said

21   well, we don't see any language in the claim that helps us so

22   the District Court then went to the specification and they said

23   look at the specification, the only examples given there of the

24   baffle is that it must extend inwardly at either an acute or an

25   obtuse angle.  They therefore concluded that the term baffle

Case 3:12-cv-00096-JAJ-RAW   Document 55   Filed 07/26/13   Page 30 of 48
AMERICAN HUNTING INNOVATIONS vs. SAVAGE SPORTS CORPORATION

30

1   should be properly construed to require that it be either obtuse

2   or acute and not perpendicular.

3          In that case it was critical.  They granted Summary

4   Judgment of noninfringement because the accused design was

5   perpendicular so the Federal Circuit was faced with that, did

6   they read limitations into the claim?  So what did they do

7   first?  They looked at the claim language and this is why I have

8   a copy of it for the Court.  I am sorry it is not on the

9   PowerPoint; but if we look at the hard copy, we can look at the

10  limitations in the claim.  There's nothing in there about acute

11  or obtuse or perpendicular or nonperpendicular, but what it says

12  in the latter part of the claim, it says, "Further means

13  disposed inside the shell for increasing its load-bearing

14  capacity comprising internal steel baffles extending inwardly

15  from the steel shell walls," so the Federal Circuit said okay,

16  what limitations are there in that claim with respect to baffle?

17  It's got to be a part of the load-bearing capacity, it's got to

18  be steel, and it's got to extend inward, so those are the only

19  limitations.  There's no limitations there about it being obtuse

20  or acute or not perpendicular.

21          They then looked at the other claims and didn't see

22  any issues there.  They went to the specification then and the

23  specification talked about the load-bearing capacity, the --

24  that it extend -- the baffles extend inwardly and that they be

25  made of steel and they concluded -- they then reversed the

Case 3:12-cv-00096-JAJ-RAW   Document 55   Filed 07/26/13   Page 31 of 48
AMERICAN HUNTING INNOVATIONS vs. SAVAGE SPORTS CORPORATION

31

1   Summary Judgment, told the District Court to follow their

2   guidelines, in effect ruling that the District Court had read

3   limitations into the claim.

4        Well, that -- that's not a surprising ruling here.

5   There's nothing in that claim about -- about obtuse angles or

6   acute angles or nonperpendicular.  That's an example of reading

7   limitations from the specification in the claims.  That's what

8   we can't do here.

9        What the Federal Circuit told us to do is they told us

10  we've got to interpret the claim language as one with ordinary

11  skill would interpret that language, so Mr. Trout talked for a

12  moment about the experts.  Let me just visit that briefly.

13       Mr. Michael Sturm is a -- he has an engineering

14  degree, former Patent Office examiner, very experienced patent

15  attorney, avid, avid bow hunter; but, he never designed a modern

16  bow, he never worked as an engineer for a bow manufacturer,

17  never had formal training in bow technology.  We've appended

18  pertinent parts of his deposition where he admitted these

19  things.  He also said in his deposition that the person with

20  ordinary skill in the art as it pertains to these patents is

21  somebody who designs bows.  That's Mr. Fogg.

22       We look at Mr. Fogg's background, 15 years employed as

23  a bow engineer at Hoyt, working his way up from a product

24  manager or product engineer up to a director of engineering, got

25  his own consulting firm where he designs bows and other

Case 3:12-cv-00096-JAJ-RAW  Document 55  Filed 07/26/13  Page 32 of 48
AMERICAN HUNTING INNOVATIONS vs. SAVAGE SPORTS CORPORATION

32

1  products, spent a lot of time working with patent attorneys to

2  draft patent applications and avoid patent claims and the like

3  so if you talk about a technical expert in this field, that's

4  Jason Fogg, that is not Mr. Sturm who is an experienced patent

5  attorney, so in -- in deciding how much weight to give their

6  testimony, we feel that's an appropriate consideration.

7          So let's get into the claim construction.  Says first

8  string guide and second string guide.  They contend, Mr. Kempf

9  contends, that it is everything on the first limb that guides a

10  string and now Bowtech says a first or second string cam or

11  pulley for guiding a string as it is taken up or let out, when

12  the arrow is drawn back for shooting and released.  Well,

13  certainly, at first blush, where did that language come from?

14  Well, where it came from is it came from the claims and the

15  specification.

16          THE COURT:  Can we jump to one of their arguments that

17  I find compelling and I want to know why I shouldn't and that is

18  when we're construing statutes, when we're construing contracts,

19  whenever we are construing any sort of written language as in

20  here where they have used the words cam and pulley later, it

21  suggests they know what cam and pulley is, obviously they do,

22  and they use that term in claims 10 and 11, but they use string

23  guide in three.  I assume that the patent examiners are pretty

24  astute and see that sort of thing very clearly.  Why isn't that

25  a powerful indication that string guide means something broader

Case 3:12-cv-00096-JAJ-RAW   Document 55   Filed 07/26/13   Page 33 of 48
AMERICAN HUNTING INNOVATIONS vs. SAVAGE SPORTS CORPORATION

33

1   than cam and pulley?

2         MR. HEUSER:   The fact is it doesn't matter whether it

3   is cam or pulley.  It could be rotatable members.  It doesn't

4   matter from an infringement standpoint.  We are using cams and

5   pulleys, they are using cams and pulleys, everybody in the field

6   does, so if you want to call them rotatable members, that's

7   fine, we're fine with that, because that's what the claim

8   required so let's consider -- I think it is a good point that

9   the other claims do use the terms cam and pulley and they do

10  require like the first string guide be a cam or the first string

11  guide be a pulley, so they apply it a little differently; but it

12  is a very good point and I think we're probably better off if we

13  say simply rotatable member, rotatable member.  The claim

14  requires that, so let's talk in terms of that being a rotatable

15  member instead of cam or pulley.  It doesn't matter for this

16  case, Your Honor.

17        So if we -- if we go to the first string guide, what

18  is the claim?  We've got to look at the claim first.  What does

19  the claim tell us?  The claim tells us more than merely using

20  the term first string guide.  What does it say?  So B and D talk

21  in terms of string guides, but we have got C and E here that

22  talk about means for journaling.  That tells us that whatever

23  these string guides are, they're mounted on the limbs to rotate.

24  We know that from the claim.  That's what it says.  Similarly F

25  and G talks about the strings being coupled is the means for

Case 3:12-cv-00096-JAJ-RAW  Document 55  Filed 07/26/13  Page 34 of 48
AMERICAN HUNTING INNOVATIONS vs. SAVAGE SPORTS CORPORATION

34

1    journaling, we already know provides the rotatability function.

2    They have to rotate.  That's the claim --

3              THE COURT:  So why do you have to say rotatable member

4    in context of string guide if you say that journaling

5    automatically provides rotation?

6              MR. HEUSER:  They might have said that.  They might

7    have -- I think though that if you look at the way -- it didn't

8    say rotatable member, it says string guide, you're right.  They

9    might have -- they might have used rotatable, they might have

10   just said cam or pulley --

11             THE COURT:  But I thought the point of journaling is

12   to make sure that it is rotatable and so therefore why would you

13   say it again in another -- in another portion of the claim?

14             MR. HEUSER:  Because you don't have to say it twice.

15   The point is they just said first string guide --

16             THE COURT:  That's my whole point, you don't have to

17   say it twice.  So you say cam or pulley or rotatable member, but

18   if you have already got journaling in another section of the

19   claim, then we've already got the rotational elements in one of

20   the claim specifications.

21             MR. HEUSER:  That's a good point, but we've got to

22   read -- we're interpreting the entire claim.  We are not

23   interpreting these particular limitations in isolation.  We've

24   got to look at the whole claim so we can't just say a first

25   string guide is anything that guides a string.  We have to look

Case 3:12-cv-00096-JAJ-RAW  Document 55  Filed 07/26/13  Page 35 of 48
AMERICAN HUNTING INNOVATIONS vs. SAVAGE SPORTS CORPORATION

35

1   at the whole claim.  That's what Phillips told us.

2           You are right, if you interpret it to mean rotatable

3   cam or pulley, I suppose that might be saying it twice; but what

4   I am saying is that you've got to look at the entire claim and

5   the way it is used so there's nothing -- there's no violation of

6   Phillips or any other Federal Circuit case where we interpret

7   that claim language in view of the entire claim so that's why we

8   know -- we know they're journaled to the limbs, we know they

9   rotate -- they -- H and I provides -- it talks about how an

10  arrow is mounted to the second string.  We know the second

11  string is the bowstring.

12          Here we say the arrow is extended from the second

13  string to the riser, and the arrow is coupled to the second

14  string at a point rearward of the first string guide.  Now, here

15  it is forward of the first string guide.  When they recite that

16  it is rearward of the first string guide, we know that the

17  string has -- therefore the arrow has been pulled back so at

18  that point we know that the claim there is talking about it

19  being pulled back so what happens as it is being pulled back?

20          We know given that the journaling means are there, we

21  know that the rotatable members are rotating.  That's what the

22  claim requires.  The claim doesn't say -- they can't be

23  stationary for that thing to be drawn back.  We know that.  We

24  don't have to look to an expert in the art to know that.  We

25  know if you pull it back, they are going to be rotating, but

Case 3:12-cv-00096-JAJ-RAW  Document 55  Filed 07/26/13  Page 36 of 48
AMERICAN HUNTING INNOVATIONS vs. SAVAGE SPORTS CORPORATION

36

1  that's -- that's how we interpret first string guide when we

2  look at the entire claim language.

3        Again, looking at the crossbow, again for this point,

4  coupled to the second string rearward of the first string guide,

5  it's got to be pulled back, so we know again we are talking

6  about cocking the -- cocking the bowstring, pulling it back, and

7  to pull it back, of course, the string guides have to be

8  rotated.

9        The spec talks about it being a cam or a pulley; but

10  again, I don't care if it is a cam or a pulley or just a

11  rotatable member.  They repeatedly talk about pulley, cams

12  throughout -- throughout the specifications and Mr. Trout makes

13  the point citing the last paragraph of the patent how the claim

14  should not be limited to the particular embodiment and that kind

15  of thing.  I know you have had other patent cases.  You know

16  that every patent has that last paragraph.  That's what patent

17  attorneys put in their patents.  That doesn't mean it covers

18  everything.  You are limited to the claims properly construed

19  normally by the intrinsic evidence.

20        Again, the spec talks about pulling it back and

21  cocking it, same thing with respect to the crossbow, talks about

22  pulling it back and cocking it, but we already know that.

23        Now, we look to the extrinsic evidence, we go to the

24  experts, we look to Jason Fogg, and he says the string guide is

25  not a term of art.  Mr. Sturm never objected to that so I think

Case 3:12-cv-00096-JAJ-RAW  Document 55  Filed 07/26/13  Page 37 of 48
AMERICAN HUNTING INNOVATIONS vs. SAVAGE SPORTS CORPORATION

37

1   they agree it is not a term of art so it is not a situation

2   where they're saying this is what string guide means in the art.

3   No real definition, so -- and Mr. Fogg concluded that consistent

4   with the interpretation of string guides being a cam or pulley

5   that takes up or lets out string.

6           Now, Mr. Trout noted that there was no extrinsic

7   evidence that supported our position on let out or take up, but

8   to the contrary, Mr. Sturm, in his report, cited two patents,

9   actually cited a third one because he cited Mr. Fogg's patent,

10  but the two other patents that he cited both talk about take up

11  or let out.  They both talk about it.  It just so happened

12  because a lot of patents in this field talk about take up or let

13  out, there's no dispute as to that's how they work, we all know

14  that, and so you can look at the Darlington and Larson patents,

15  and I referred in my brief where they talk about let up and take

16  out, it is all around the extrinsic evidence.  I didn't put that

17  in my brief, I hadn't collected any evidence of that because I

18  didn't think that was going to be an issue, but the fact is it

19  is in the extrinsic evidence that is before the Court.

20          Now, Mr. Kempf, his expert talks about grooves and

21  walls and keeping the string in the groove if the bow is bumped

22  or jarred.  Mr. Trout showed us drawings that Mr. Sturm created.

23  Well, Mr. Sturm does not start his analysis with the claims, he

24  doesn't then go to the specification as Phillips tells us he is

25  supposed to do.

Case 3:12-cv-00096-JAJ-RAW  Document 55  Filed 07/26/13  Page 38 of 48
AMERICAN HUNTING INNOVATIONS vs. SAVAGE SPORTS CORPORATION

38

1        What he does is he jumps to these drawings he's

2   created talking about -- talking about walls and grooves and we

3   know that cams and pulleys all have walls and grooves, of course

4   they do; but one of the things that he talks about is he says

5   that those -- the first string guides don't have to be movable.

6   They don't have to be movable, but wait, the -- the claims

7   require that they be movable, the specification talks about them

8   being movable, so if -- if the proper interpretation is that a

9   string guide doesn't have to be movable, you'd think that it

10  would be more appropriate that it would be a first and second

11  string holder.

12        There's no basis -- talk about out of thin air,

13  there's nothing in the intrinsic evidence at all that talked

14  about a stationary string guide that is designed to hold the

15  string in place if it is bumped or jarred.  That's nowhere in

16  the patent.  We compare that to the discussion of the rotation

17  of the cams and pulleys as the bowstring is pulled and released,

18  we know they are rotating members.

19        New, Mr. Trout cites to Mr. Fogg's own patent.  He

20  provides a definition of a pulley for the purposes of that

21  patent.  That just shows that you refer to the specification.

22  His patent attorney knew that when the claims were being

23  interpreted, the Court would go to the specification and he

24  provided a definition in that specification for that patent that

25  would be applied to the claims.  That simply shows us that again

AMERICAN HUNTING INNOVATIONS vs. SAVAGE SPORTS CORPORATION

39

1  the Phillips case says the specification is the best guide for

2  what the claim language means.

3        So just to summarize again, they talk about it being

4  everything that guides a string, and we think there's plenty of

5  basis there, in fact, the language cries out to be defined as

6  rotatable members, and let's call them rotatable members instead

7  of cams or pulleys, but they do take up and let out as the arrow

8  is being pulled back.  That's what the claims talk about, that's

9  what the spec talks about.

10        Mr. Kempf's construction, it really violates -- if he

11  is talking about anything that guides a string, they're trying

12  to get us into the journaling means.  The journaling means has

13  to be very different, very different from the first string guide

14  and the second string guide and as the Court can see in the

15  crossbow in front of you, in that design you've got the second

16  string, that is the bowstring goes between the cams, between the

17  first and second string guide; but then you see the first

18  strings or the cables go between the cams or pulley and the

19  means for journaling.  It goes to the axle.

20        So what is really important here is that -- is that

21  we've got to remember that Provision F talks about means for

22  journaling.  It doesn't say that the cable extends between the

23  first string guide and the means for journaling.  It extends

24  between the first string guide and the second string guide and

25  to ignore that limitation is violating the very basic

Case 3:12-cv-00096-JAJ-RAW   Document 55   Filed 07/26/13   Page 40 of 48
AMERICAN HUNTING INNOVATIONS vs. SAVAGE SPORTS CORPORATION

40

1   construction rule, that is you've got to give effect to every

2   provision in the claim and that's some of the cases there that

3   we have cited so it cannot be construed to include as a means

4   for journaling as one of the two string guides.

5           We've talked about some of the other -- there was some

6   confusion.  I guess it sometimes happens when people exchange

7   briefs at the same time.  We construed in our first brief the

8   first and second string guides and Clause F and then we talk

9   about nock point because that's the only terms they identified

10  in their first identification and they address all of our

11  points.  I think then we did -- I addressed all of their points

12  in our rebuttal brief.  At any rate I think that sometimes

13  happens, but I think we agree that a lot of this language has to

14  be interpreted.

15          The means for journaling, we don't have any dispute

16  there.  They said that it covers anything that journals the

17  first or second string guide to the first limb when really this

18  is means plus function language.  I know the Court is aware that

19  means plus function language is guided by Section 112, Paragraph

20  6, which is now changed to Paragraph F, but it still says that

21  you've got to look to cover the corresponding structure,

22  material, or acts described in the specification and equivalents

23  thereof.  We don't decide equivalents at a Markman hearing so

24  really we go to the spec, see what's covered, see what -- well,

25  the means for journaling, we know that, then you go to the

Case 3:12-cv-00096-JAJ-RAW  Document 55  Filed 07/26/13  Page 41 of 48
AMERICAN HUNTING INNOVATIONS vs. SAVAGE SPORTS CORPORATION

41

1    specification, you see it discloses axles, but I don't think the

2    parties disagree on what the means for journaling is, they're

3    axles, and so that's -- I don't think that's a dispute.

4           Then we get to F, and F is the one I alluded to

5    previously.  This says a first sting coupled to the second

6    string guide and the second string guide, it doesn't say coupled

7    to the first string guide and to the means for journaling.  It

8    can't be construed so broadly.

9           Again, we talked about coupled.  I will talk about

10   coupled again in a moment, but again, it -- they let out and

11   take up, again we go back to the term string guides and our

12   definition there is pertinent.  It doesn't say coupled the first

13   string guide into the second journaling means.

14          G is a fairly long clause and we tried to come up with

15   language that one skilled in the art would be able to

16   understand, one skilled in the art would say this is what is

17   being said here.  We try to do it in a way that would be

18   understandable to the jury so the other side proposed that it be

19   any string coupled to the fronts of the string guides; but when

20   you look at the entire claim language, and you break this out

21   phrase by phrase, you can see that our claim language, our

22   proposed claim interpretation is required by the claims.

23          So if we -- if we look at the claim three, for

24   example, and now we are interpreting -- we're interpreting what

25   is a second string, H and I here, H and I required that the

Case 3:12-cv-00096-JAJ-RAW   Document 55   Filed 07/26/13   Page 42 of 48
AMERICAN HUNTING INNOVATIONS vs. SAVAGE SPORTS CORPORATION

42

1 second string be a bowstring and Mr. Trout talked about it with

2 you, it has got to be a bowstring because the arrow was coupled

3 with the second string and we know that the arrow has to be

4 coupled to the bowstring, it is not going to be coupled to the

5 cables, it is shown in the drawings as well, so we know the

6 bowstring has to be the second string, we know that, therefore

7 it is not any string, it is the second string, and then

8 Paragraph G talks about it a little bit more, I won't go through

9 that because I don't think we have any disagreement there on

10 what the bowstring is, but both the specification and the claims

11 talk about it.

12         Let's talk now about the -- G talks about -- well, it

13 is -- I don't -- I don't think we disagree on that; but let's

14 just look to see what the first point and the second point are

15 because the claims and the spec make it clear what is meant by

16 this.  We propose in our construction that the first point and

17 the second point be the first contact with the cam or pulley.

18         Now, we know that -- we know that the bowstring is

19 mounted to the pulley, mounted to the cam, and we know it is

20 mounted somewhere around the circle of the pulley.  It has got

21 to be mounted to a post or somehow fastened to the pulley, but

22 -- so it could be coupled anywhere there; but Paragraph G helps

23 us, because it tells us where that first point has to be.  It

24 says, "A second string coupled from a first point on the first

25 string guide forward of the first journaling means," so here is

AMERICAN HUNTING INNOVATIONS vs. SAVAGE SPORTS CORPORATION

43

1   the first journalling means is that (Indicating) on the left, we

2   know that it is forward of the first journalling so it has to be

3   somewhere up here (Indicating) and the point of first contact is

4   forward of the first journaling means to a second point on the

5   second string guide forward of the second journaling means.

6   Again, that's forward in the direction of shooting of the second

7   journaling means, so that helps us -- helps tell us where the

8   first point and the second point are.

9           Now, if we look to the specification here, we see --

10  I'm sorry, the printing is a little small -- but this defines it

11  a little bit differently, but requires -- or it uses different

12  language to require the first thing.  It says that the bowstring

13  is coupled to a pulley in a position located between the first

14  journaling point and the riser, so it says it is coupled to it

15  between the first journaling point and the riser over here.

16  (Indicating)  So again, that first journaling point, that's the

17  first point at which it is coupled, has to be the first point of

18  contact because that's between the journaling means and the

19  riser and again, similarly the bowstring is coupled to cam seven

20  and six, there is a position located between them, a second

21  journal point, and the riser 64 so again, we know now what is

22  meant by first point.  It is that first point of contact with

23  the string on the cam or pulley.

24          So the language -- it would be nice to say any string

25  coupled to the fronts of the string guide, that would be nice

Case 3:12-cv-00096-JAJ-RAW   Document 55   Filed 07/26/13   Page 44 of 48
AMERICAN HUNTING INNOVATIONS vs. SAVAGE SPORTS CORPORATION

44

1  and simple, that would be very sharp; but we think after going

2  through this the Court will see that the bowstring is the second

3  string, the first point of contact is that point, that first --

4  the -- it is the first point at which the string contacts the

5  pulley, and then we just get down to the definition of string

6  guides which we have previously said is a rotatable member that

7  rotates and I guess we don't even get to that there.  It talks

8  about the bowstring operation.  That's what I just covered, the

9  claim language requires that interpretation, so unfortunately we

10 have to get into more detail, but this is the language that the

11 jury is going to understand going through this.

12        Means for retaining a cocked position, again this is

13 Section 112, Paragraph 6 or Paragraph F, it is a releasable

14 catch mechanism.  We have to go to the specification under 112,

15 Paragraph 6, we see that the catch mechanism 84 is described.

16 Again, I don't think the parties disagree on what that is, it is

17 just important that the Court apply Section 112, Paragraph 6, in

18 an appropriate way.

19        So the point about the cam and pulley is a very good

20 one, Your Honor.  It is recited in the other claims and

21 therefore if the Court wants to say it is a rotatable member

22 instead, that's just fine, we know it has to rotate from the

23 claim and from the specification and we are not using language

24 twice when we interpret string guide to be a rotatable member.

25 We are using the entire claim language to support our

Case 3:12-cv-00096-JAJ-RAW  Document 55  Filed 07/26/13  Page 45 of 48
AMERICAN HUNTING INNOVATIONS vs. SAVAGE SPORTS CORPORATION

45

 1   construction which is what Phillips tells us we should be doing.

 2   That's all I have, Your Honor.

 3          THE COURT:  Thank you.  Mr. Trout, do you have brief

 4   rebuttal you would like to make?

 5          MR. TROUT:  Your Honor, may it please the Court.  I

 6   just have a few brief remarks.  The explanation that means plus

 7   function language is limited to the preferred embodiment is

 8   correct.  We are not trying to argue every last little detail.

 9   That's why we surrendered on the means for journaling would be

10   an axle assembly because means for journaling language, as Mr.

11   Heuser explained earlier, that the rule was changed so that you

12   are limited.

13          We are talking about string guide and we are talking

14   about, you know, all the other terms in here, we are not talking

15   about means plus function language.  This is strictly claim

16   language that has no restriction on means plus function and that

17   cardinal sin of removing material from the specification is dead

18   on.

19          What we -- I think -- may I approach the bench to take

20   a look at, Your Honor --

21          THE COURT:  Yeah.

22          MR. TROUT:  I just wanted to make sure that that is

23   what -- the Defendants' contention that the string guide -- or

24   that the means for journaling and the string guide have to be

25   different things is very well taken.  That's correct.  They

Case 3:12-cv-00096-JAJ-RAW   Document 55   Filed 07/26/13   Page 46 of 48
AMERICAN HUNTING INNOVATIONS vs. SAVAGE SPORTS CORPORATION

46

1    can't be the same thing and we're not trying to make them the

2    same thing.

3           If that string was coupled to that axle, then it would

4    not infringe.  I think that's a pretty bold statement.  It is

5    not connected.  It is not coupled or journaled to the axle, it

6    is journaled to a portion of the string guide.  It is very

7    difficult to see if you look on there, but there is another

8    component of the string guide that it is coupled to instead of

9    being coupled directly to the axle; and if I may, according to

10   Mr. Fogg, the Defendants' expert, the term encompasses not only

11   a wheel such as what is coupled there or a cam, but the assembly

12   of the two, so it is a very well taken point that if we were to

13   try to say that if it was coupled to the axle, then we would be

14   saying one thing is two things and we're definitely not saying

15   one thing is two things.  The string is coupled to a portion --

16   both strings are coupled to a portion of the string guide.

17          Now, in terms of the question of the first point of

18   contact and how these things move, I mean, all those things are

19   taken from the preferred embodiment.  The -- when you look at

20   the claims, it says, you know, coupled from a point on the

21   string guide forward of the journaling means, then to pick out a

22   specific point that is not forward of the journaling means is

23   inaccurate.  I mean that-- you cannot do that.

24          If it is coupled anywhere in front, I mean, you would

25   have to take it from somewhere in front.  The claims are not

AMERICAN HUNTING INNOVATIONS vs. SAVAGE SPORTS CORPORATION

47

1   limited in that way and to take anything from the specification

2   in terms of how the bow operates to pick a specific point being

3   the first point of contact, there is no support for that

4   whatsoever.

5           Nothing further, Your Honor.

6           THE COURT:  Thank you very much.  This has been very

7   helpful and I am, of course, going to reserve ruling, but we

8   will get something out in a couple weeks.

9           MR. HEUSER:  Your Honor, would you like to keep this

10  crossbow?

11          THE COURT:  Thank you.  No.  We will give that back to

12  you.  Thanks.  We are in recess.

13          (Proceedings concluded at 2:36 p.m., July 9, 2013.)

14

15

16

17

18

19

20

21

22

23

24

25

AMERICAN HUNTING INNOVATIONS vs. SAVAGE SPORTS CORPORATION

48

1                    C E R T I F I C A T E

2

3

4            I, the undersigned, a Certified Shorthand Reporter of
   the State of Iowa, do hereby certify that I was called in the
5    capacity of a Certified Shorthand Reporter to report the
   foregoing proceedings in the above-captioned matter and that
6    same was taken down by me in stenotype and later reduced to
   Computer-Aided Transcription under my supervision and direction,
7    and that the foregoing Transcript of Proceedings is a true
   record of the testimony given and all objections interposed and
8    rulings made thereon.

9

10           I further certify that I am neither attorney or
   counsel for, nor related to or employed by any of the parties to
   the action in which these proceedings were had, and further,
11   that I am not a relative or employee of any attorney or counsel
   employed by the parties hereto or financially interested in the
12   action.

13

14           Dated at Davenport, Iowa, this 26th day of July,
   2013.

15

16                    /s/ Linda Faurote-Egbers
                   Certified Shorthand Reporter
17

18

19

20

21

22

23

24

25